**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| |
|---|
| SUZANNE RICHARDS and SMR HEALTHCARE MANAGEMENT, INC. |
| v. |
| AMERICAN ACADEMIC HEALTH SYSTEMS, LLC, PALADIN HEALTHCARE CAPITAL, LLC and JOEL FREEDMAN |

CIVIL ACTION NO.: 2:20-cv-0059-TJS

## AMENDED COMPLAINT AND JURY DEMAND

Plaintiffs, Suzanne Richards and SMR Healthcare Management, Inc., by and through their attorneys, Bell & Bell, LLP, hereby file the following Amended Complaint and Jury Demand ("Complaint").

## PRELIMINARY STATEMENT

1. This is an action for an award of damages, liquidated damages, and other relief on behalf of Plaintiffs Suzanne Richards ("Ms. Richards") and SMR Healthcare Management, Inc., ("SMR") (collectively "Plaintiffs"), against Defendants American Academic Health System, LLC ("AAHS"), Paladin Healthcare Capital, LLC ("Paladin") (hereinafter, AAHS and Paladin are collectively referred to as "the Company"), and Joel Freedman, the Owner, Chairman and Chief Executive Officer of AAHS and a former owner, Chairman and Chief Executive Officer of Paladin (hereinafter, AAHS, Paladin and Mr. Freedman are collectively referred to as "Defendants"). Plaintiffs have been harmed by the Company's breach of contract, Defendants' defamation of Plaintiffs, fraudulent inducement, and failure to pay wages to Ms. Richards that include earned bonus pay in violation of the

Pennsylvania Wage Payment and Collection Law.  Plaintiffs also raise claims of promissory estoppel/detrimental reliance, and unjust enrichment.  This action arises under the Pennsylvania Wage Payment and Collection Law, 43 Pa. C. S. § 260.1, et seq. ("WPCL") and Pennsylvania common law.

## JURISDICTIONAL STATEMENT

2.  This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

3.  The amount in controversy in this matter exceeds the jurisdictional minimum exclusive of interest and costs.

4.  The Parties hereto are citizens and/or residents of different states.

5.  Plaintiff Suzanne Richards is a resident and citizen of Las Vegas, Nevada.

6.  Plaintiff SMR is a Nevada corporation with its principal place of business in Nevada.

7.  Defendant AAHS is a Delaware corporation with its corporate headquarters and principal place of business in California.

8.  Defendant Paladin is, upon information and belief, a Delaware corporation with its corporate headquarters and principal place of business in California.

9.  Defendant Joel Freedman is, upon information and belief, a citizen and resident of Pennsylvania.

10. This Court has jurisdiction over any Pennsylvania state law claims pursuant to 28 U.S.C. § 1367.

## VENUE

11. This action properly lies in the Eastern District of Pennsylvania, pursuant to 28

U.S.C. § 1391(b) because the claims arose in this judicial district.

12. This action properly lies in the Eastern District of Pennsylvania because significant activities associated with the claims alleged took place in this jurisdiction, Plaintiffs performed their work for Defendants in this jurisdiction, and the causes of action alleged herein arose from conduct in this jurisdiction.

## PARTIES

13. Plaintiff Suzanne Richards is an adult, female individual resident and citizen of Las Vegas, Nevada and the United States of America.

14. Plaintiff SMR is a Nevada corporation with its principal place of business in Nevada.

15. Defendant AAHS is a Delaware corporation with its corporate headquarters and principal place of business in California. AAHS has a corporate address at 222 N. Sepulveda Blvd., Suite 900, El Segundo, CA 90245. Upon information and belief, none of AAHS' members are citizens of Nevada.

16. Defendant Paladin is a Delaware corporation with its corporate headquarters and principal place of business in California. Paladin has a corporate address at 222 N. Sepulveda Blvd., Suite 900, El Segundo, CA 90245. Upon information and belief, none of Paladin's members are citizens of Nevada.

17. Defendant Joel Freedman is the owner, Chairman and Chief Executive Officer of AAHS and a former owner, Chairman and Chief Executive Officer of Paladin.

18. Defendants AAHS and Paladin each were and are business entities that do significant business within the Commonwealth of Pennsylvania, are engaged in an

industry affecting commerce, acted as Ms. Richards' employers and/or contracted with Ms. Richards and SMR.

19. With respect to the Pennsylvania Wage Payment and Collection Law ("WPCL") claims alleged herein, at all times relevant hereto, Plaintiff Suzanne Richards was an "employee" of Defendants within the meaning of the Pennsylvania Wage Payment and Collection Law ("WPCL").

20. With respect to the WPCL claims alleged herein, at all times relevant hereto, each Defendant acted as a "person" and/or "employer" within the meaning of the WPCL.

21. With respect to the WPCL claims alleged herein, at all times relevant hereto, Defendant Joel Freedman had an active role in corporate decision-making, and was instrumental in decisions concerning the failure of Defendants to pay wages to Ms. Richards that are due and owing.

22. At all relevant times, employees of Defendants acted as agents and servants for Defendants.

23. At all relevant times, employees of Defendants were acting within the scope of their authority and in the course of employment under the direct control of Defendants.

24. At all times material hereto, Defendants acted by and through their authorized agents, servants, workmen and/or employees acting within the course and scope of their employment with Defendants and in furtherance of Defendants' business.

25. This cause of action arose out of transactions or occurrences that took place in whole or in part in Philadelphia, Pennsylvania.  Further, Defendants conduct substantial business within Philadelphia, Pennsylvania.

26. This Honorable Court has personal jurisdiction over the Defendants.

27. Defendants own and/or manage multiple hospitals in Philadelphia, Pennsylvania including Hahnemann University Hospital and St. Christopher's Hospital for Children.

28. Defendants AAHS and Paladin, at all relevant times, had common ownership, management and are interchangeable business entities.

29. Defendant AAHS and Paladin were, at all relevant times, operated as one single business entity. For example, among other things, despite the written consulting agreement with SMR being with Philadelphia Academic Health System, LLC ("PAHS"), SMR and Ms. Richards were paid by AAHS and all other Agreements were with AAHS.

30. AAHS, PAHS and Paladin used their corporate identities interchangeably with respect to contract formation and shared mailing addresses and corporate offices.

31. AAHS, PAHS and Paladin shared resources, including employees, during Ms. Richards' employment.

32. During their engagement with the Respondents, Ms. Richards and SMR performed significant work for and/or on behalf of PAHS, AAHS and Paladin.

33. This Honorable Court has personal jurisdiction over the Defendants.

## **FACTS**

34. In January of 2018, Mr. Freedman, through his companies AAHS, PAHS and Paladin, acquired Hahnemann University Hospital and St. Christopher's Hospital for Children.

35. During the Summer of 2018, Ms. Richards was aggressively recruited by Defendants.

36. After extensive recruitment efforts by Mr. Freedman and other representatives of Defendants, Ms. Richards began working for Defendants in September 2018.

37. Pursuant to a Consulting Services Agreement (the "Agreement") between Ms. Richards' company SMR Healthcare Management, Inc. and PAHS dated September 20, 2018, Ms. Richards was expected to provide services that included assisting Mr. Freedman with overseeing and administering Defendants' business on a day-to-day basis, assessing the operational and clinical capabilities of the health system, identifying areas for clinical and financial improvement, performing talent assessment regarding Defendants' organization, assessing facility operations, and other duties that Defendants assigned from time to time.[1]

38. The Agreement provided that Ms. Richards was to be compensated at the rate of $3,000 per day for on-site work, $500 for travel of greater than four hours when travel was not on a day billed as an on-site day, and $300 per hour for off-site product work.

39. The Agreement provided that Ms. Richards' employees at SMR were to be compensated by Defendants at certain daily, travel and off-site hourly rates as well.

---

[1] During the recruitment process, Mr. Freedman repeatedly sought for Ms. Richards to manage the hospitals. In response, Ms. Richards proposed a management agreement to Mr. Freedman, which he rejected. Ms. Richards learned from AAHS counsel that Mr. Freedman was not able to outsource management without getting bank approval pursuant to his financing arrangement.

40. The Agreement provided that any late payments by Defendants would be subject to a 3% interest rate, to be compounded monthly.

41. The Agreement also provided that Plaintiffs were entitled to a bonus of $500,000 at the end of the initial term – four months after September 20, 2018.

42. The Agreement provided that either party could terminate the Agreement without cause on twenty (20) business days' prior written notice.

43. Upon agreeing to start work for Defendants, Ms. Richards observed an operation in relative chaos, as the organization was being run by Mr. Freedman who admittedly, "did not understand operations."

44. Indeed, Mr. Freedman confided in Ms. Richards that "he could not do this by himself" and that he did not "have anyone who knew what they were doing" and he was "losing money."

45. Despite this, Ms. Richards set to the task of attempting to turn the organization around and put it on a path for success.

46. Shortly after commencing her work for Defendants, Ms. Richards observed a tendency of Mr. Freedman and others within his organization to engage in conduct and comments that were derogatory of employees and others on the basis of their gender, disability status, and other protected classes.  Over the course of her engagement, some of this conduct was even directed at Ms. Richards and her staff.[2]

---

[2] Ms. Richards has filed a Complaint of Discrimination with the Pennsylvania Human Relations Commission relating to her claims of discrimination, harassment and retaliation.  She intends to seek leave to amend this Complaint to add those claims once she has fully exhausted her administrative remedies.

47. Despite the Agreement with SMR, Mr. Freedman constantly pressured Ms. Richards to agree to work for him as a full-time employee. Mr. Freedman attempted to entice Ms. Richards by making various promises including ownership interest and an ability to "phone it in."

48. Significantly contributing to the chaos within the organization was the fact that Mr. Freedman appeared to hire and fire executives on a whim.

49. In December of 2018, Mr. Freedman ordered that Chief Executive Officer Anthony Rajkumar, who had only recently been placed in the role, be terminated as part of an alleged reduction in force. This marked the fourth CEO eliminated by Mr. Freedman in less than a year of his ownership. Although Mr. Freedman claimed to have ordered Mr. Rajkumar be terminated because of an additional 250 nurses being added to the payroll "on his watch", it was clear that the driving force behind adding these nurses had actually been Mr. Freedman himself.

50. After Mr. Rajkumar's termination, Mr. Freedman increased his pressure on Ms. Richards to accept a position as CEO. In response to his efforts, Ms. Richards would remind him that she was only serving on an interim basis, and that she would search for other individuals to fill such roles.

51. Later in December of 2018, Ms. Richards became aware that Mr. Freedman was involved in a dispute with Tenet Healthcare, the former owner of Hahnemann and St. Christopher's. Mr. Freedman had provided false and misleading statements for publication that Tenet had fraudulently overstated the financial situation of the hospitals at the time they sold them to him.

52. On or about January 15, 2019, Mr. Freedman stated  that "Suzanne earned her bonus" – referencing the $500,000 bonus in the Agreement, and that his "greatest fear is that Suzanne will leave him."

53. Shortly thereafter, Ms. Richards attended a meeting with potential investors and Mr. Freedman where Mr. Freedman stated that Ms. Richards was "the best in the business" and falsely represented that Ms. Richards had "started full time."

54. Mr. Freedman frequently had Ms. Richards perform work on behalf of all of his companies interchangeably.  For example, on one particular occasion, Mr. Freedman requested Ms. Richards' assistance with an effort to convince the CEO of Howard University Hospital – a Paladin operated hospital – to resign.

55. In connection with this effort, Mr. Freedman insisted that Ms. Richards accompany him to a meeting at Howard University Hospital to "help fix the issues" at Howard.  During this meeting, Mr. Freedman described Ms. Richards as "the best in the business" and stated that she was "now working for Paladin."

56. On another occasion, Mr. Freedman insisted that Ms. Richards accompany him to a meeting to attempt to secure a new contract for Paladin at the University of Connecticut.  During the presentation, Ms. Richards was described as the "System CEO".

57. At or around this same time, Defendants, through Gary Frazier and Mr. Freedman, sent out a memorandum that Ms. Richards was the "new interim CEO", which was carried in the Philadelphia Inquirer and Business Journal.

58. Becker's Hospital Review also published an article based upon information provided to media outlets by Defendants, indicating that Ms. Richards had been named CEO of Hahnemann and St. Christopher's.

59. Shortly thereafter, Mr. Freedman insisted that Ms. Richards accompany him to meet with several finance companies, including MidCap.  During these meetings, Mr. Freedman consistently but inaccurately informed the potential finance partners that Ms. Richards was "now joining full time."

60. In or around late January or early February, Mr. Freedman had multiple meetings with Ms. Richards where he attempted to extend the term of the Agreement and informed Ms. Richards that she was "not paid what [she] is worth."  Mr. Freedman indicated that Ms. Richards had "done a great job", that he "could not do this without [her]" and that she had "earned [her] bonus."  Mr. Freedman was insistent that he wanted to be able to present to the bankers that Ms. Richards had "joined."

61. In early February of 2019, Ms. Richards took a short time off to have a scheduled surgery.

62. During this time, on February 8, 2019, Mr. Freedman told Ms. Richards that he wanted to "firm up" the arrangement with a proposal and payment of the bonus.

63. On February 12, 2019, Ms. Richards sent a text message to general counsel for the Company indicating that her surgery had been more difficult than anticipated.

64. That day, after sending this text message, despite only previously receiving praise from Mr. Freedman, Ms. Richards received a text message from Mr. Freedman that appeared to be critical of her performance.

65. Ms. Richards received a phone call from a third party later that week relaying further criticism of Ms. Richards by Mr. Freedman that Mr. Freedman had shared with him.  This individual indicated that Mr. Freedman had told him that "Suzanne is good, but not enough in the weeds."

66. Mr. Freedman also questioned other employees about Ms. Richards' future plans for vacation.

67. In late February, after Ms. Richards returned to Hahnemann to work on-site, Ms. Richards attended a finance meeting with, among others, Gary Bryant and Mr. Freedman during which Mr. Bryant informed the attendees that the system was at almost $10 Million in losses for the month of January.  When Ms. Richards questioned what caused the dramatic increase in losses, Mr. Bryant informed her that there had been a roughly $3.2 Million increase in consulting fees at AAHS – an increase that matches a "management fee" that Mr. Freedman had referenced and asked be paid to him during a meeting in December of 2018.  When Ms. Richards asked what consultants had been retained by AAHS, and looked at Mr. Freedman, Mr. Freedman remained silent.

68. Shortly after this meeting, Ms. Richards attended a meeting with Mr. Freedman during which he told her, "I am so glad you are back", "I can't do this without you" and "it makes me feel much more calm now that you are here."  Mr. Freedman also stated that he "wanted a commitment" and that he "had a proposal" that included Ms. Richards' bonus payment that had already been earned."

69. After Mr. Freedman had left Ms. Richards' office, Gary Frazier, an employee of Paladin and AAHS, expressed concern regarding Mr. Freedman's involvement in operations and urged Ms. Richards that "we need to keep Joel from running the hospital."  Mr. Frazier then explained to Ms. Richards that the plan for purchasing the hospitals was that Barry Wolfman was supposed to have been the "face" of the hospitals and Mr. Freedman was supposed to remain in California and limit his involvement to the finance side.

70. Immediately after her taking off time to recover from surgery and complications, immediately after complaining about Mr. Freedman's inappropriate sexual comments, immediately after supporting two other female employees' complaints of harassment, Ms. Richards was targeted and unjustly criticized by Mr. Freedman.

71. Indeed, on March 3, 2019, Mr. Freedman emailed Ms. Richards lodging unjustified criticisms against Ms. Richards and two female employees.

72. As a result of the repeated inappropriate behavior and comments, and the retaliation against Ms. Richards and others, Ms. Richards felt she had no other choice than to resign from her position, and to terminate her company's contract with Defendants.

73. On March 3, 2019, Ms. Richards provided the required notice of termination provided for in the Agreement.

74. On March 4, 2019, after Ms. Richards had already provided notice that she was resigning and terminating the Agreement, Mr. Freedman sent her an email informing her that she was "gone immediately."

75. At the time of her resignation and termination of the Agreement, Ms. Richards and SMR were owed significant outstanding payments for work performed for Defendants in excess of $300,000.

76. Mr. Frazier contacted Ms. Richards and suggested that if she was owed money, she "should just leave it" because "Joel will destroy you."  Mr. Frazier indicated that "Joel is known for hurting people" and "you should just walk away."  Ms. Richards responded to Mr. Frazier that she did not intend to write off any unpaid invoices and expected them to be paid.

77. Following Ms. Richards providing notice, Defendants made a number of public, derogatory, and defamatory comments about Ms. Richards and caused a number of such comments to be publicly reported on by various news outlets.

78. For example, news of Ms. Richards' "immediate termination" and "firing" were published in Becker's Hospital Review, the Philadelphia Inquirer, Philly.com, Philadelphia Business Journal, National Health, and other media outlets.

79. On or about March 7, 2019, Mr. Freedman and Mr. Frazier[3] falsely informed The Philadelphia Inquirer that Ms. Richards was dismissed after two months as CEO of Hahnemann and St. Christopher's.  This information was republished via Becker's Hospital Review's Twitter account.

80. The Philadelphia Inquirer published an article on June 27, 2019, based upon information provided by Mr. Freedman, Mr. Frazier and Defendants, falsely claiming that in March 2019, "Suzanne Richards [was] fired just two months into

_____

[3] Mr. Frazier was well aware that Ms. Richards had not been terminated, but had actually resigned.  In fact, Mr. Frazier spoke to an SMR employee subsequent to Ms. Richards' departure and stated that he was aware that Ms. Richards had "resigned" and had not been "immediately terminated" as communicated to the various media outlets.

her tenure as chief executive of Hahnemann and St. Christopher's."  The Inquirer

published an additional article on July 1, 2019 with similar defamatory content.

81. Becker's Hospital Review published an article titled "CEO of Hahnemann, St.

Christopher's hospitals outed" indicating that Ms. Richards was fired only two

months after assuming the role of CEO for Hahnemann and St. Christopher's.

82. An article published on the Modern Healthcare website on May 13, 2019

indicates that "the Philadelphia Inquirer said she was fired by the private-equity

owners."

83. Shortly after Ms. Richards' resignation, Mr. Freedman contacted the CEO of a

prominent Philadelphia based medical group and told her, "let me tell you why I

had to fire Suzanne."

84. Prior to her unfortunate association with Mr. Freedman and Defendants, Ms.

Richards' reputation in the healthcare management community was stellar.

85. As a result of Mr. Freedman and Defendants' defamatory statements, falsely

indicating that Ms. Richards had been terminated, after only two months, Ms.

Richards' reputation has been irreparably damaged.

86. For example, Ms. Richards' and her company's reputations with their clients have

suffered and they have lost significant business as a result of Defendants'

defamation.

87. As a result of Defendants' defamation, Ms. Richards and her company have

experienced difficulty obtaining additional business.

88. Indeed, Ms. Richards and her company have received frequent inquiries from clients and prospective clients regarding her "termination" by Hahnemann and St. Christopher's after only two months.

89. Defendants breached their Agreement with Plaintiffs by failing to pay earned wages including unpaid invoices in excess of $300,000, which are accruing late payment penalties at the rate of three percent, compounded monthly.

90. Defendants breached their Agreement with Plaintiffs by failing to pay the $500,000 earned bonus.

91. Defendants breached their Agreement with Plaintiffs by failing to provide the requisite twenty business days of notice.

92. In the alternative, Defendants breached an oral or implied agreement with Ms. Richards and SMR by failing to pay wages, failing to pay the $500,000 earned bonus and failing to provide the requisite notice.

93. As a result of the Defendants' breaches, Plaintiffs have suffered great financial harm as alleged herein.

94. In failing to pay Ms. Richards wages in the form of her earned bonus that was due and owing to Ms. Richards at the time of her resignation and for a thirty-day period beyond regularly scheduled paydays, Defendants violated the WPCL.

95. Despite Ms. Richards' repeated requests that her unpaid and overdue wages be paid, Defendants have refused to make said payments.

96. Plaintiffs fully performed their obligations under the Agreement.

97. Defendants' failure to perform their contractual obligations and duties is without excuse or justification.

98. Defendants' breaches of the Agreement caused damages to Plaintiffs, including, among other losses, lost wages and substantial legal costs, which are growing every day.

99. Despite the passage of more than ten months since her resignation on or about March 3, 2019, Defendants have not paid the wages to which Plaintiff Suzanne Richards is entitled and which are described above.

100. During the period since Plaintiff Suzanne Richards' resignation, Defendants have also not paid any portion of the wages due.

101. Defendants have not given written notice to Plaintiff of the amount of wages that they concede to be due, nor paid such amount without condition within the time set by the Pennsylvania Wage Payment and Collection Law.

**COUNT I**
**Breach of Written Contract**
**(Plaintiffs v. All Defendants)**

102. Plaintiffs repeat and incorporate by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

103. Plaintiffs and Defendants entered into a written contract – the "Agreement."

104. Under the terms of the Agreement, Ms. Richards was to be compensated at the rate of $3,000 per day for on-site work, $500 for travel of greater than four hours when travel was not on a day billed as an on-site day, and $300 per hour for off-site product work.

105. The Agreement provided that Ms. Richards' employees at SMR were to be compensated by Defendants at certain daily, travel and off-site hourly rates as well.

106. The Agreement provided that any late payments by Defendants would be subject to a 3% interest rate, to be compounded monthly.

107. The Agreement also provided that Plaintiffs were entitled to a bonus of $500,000 at the end of the initial term – four months after September 20, 2018.

108. The Agreement provided that either party could terminate the Agreement without cause on twenty (20) business days' prior written notice.

109. Defendants breached their Agreement with Plaintiffs by failing to pay earned wages including invoices that total in excess of $300,000, which are accruing late payment penalties at the rate of three percent, compounded monthly.

110. Defendants breached their Agreement with Plaintiffs by failing to pay the $500,000 earned bonus.

111. Defendants breached their Agreement with Plaintiffs by failing to provide the requisite twenty business days of notice.

112. Plaintiffs fully performed their obligations under the Agreement.

113. Plaintiffs seek damages for breach of the Agreement.

114. As a direct and proximate result of the Defendants' breaches, Plaintiffs have suffered, and continues to suffer financial losses.

115. The Defendants' conduct is without excuse or justification.

**COUNT II**
**Breach of Verbal or Implied Contract**
**(Plaintiffs v. All Defendants)**

116. Plaintiffs repeat and incorporate by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

117. In the alternative to Count I, the Parties reached an verbal or implied Agreement (the "Agreement") whereby Ms. Richards was to be compensated at the rate of $3,000 per day for on-site work, $500 for travel of greater than four hours when travel was not on a day billed as an on-site day, and $300 per hour for off-site product work.

118. The Parties agreed that Ms. Richards' employees at SMR were to be compensated by Defendants at certain daily, travel and off-site hourly rates as well.

119. The Parties agreed that any late payments by Defendants would be subject to a 3% interest rate, to be compounded monthly.

120. The Parties agreed that Plaintiffs were entitled to a bonus of $500,000 at the end of the initial term – four months after September 20, 2018.

121. The Parties agreed that either party could terminate the Agreement without cause on twenty (20) business days' prior written notice.

122. Defendants breached their Agreement with Plaintiffs by failing to pay earned wages including outstanding invoices in excess of $300,000 which are accruing late payment penalties at the rate of three percent, compounded monthly.

123. Defendants breached their Agreement with Plaintiffs by failing to pay the $500,000 earned bonus.

124. Defendants breached their Agreement with Plaintiffs by failing to provide the requisite twenty business days of notice.

125. Plaintiffs fully performed their obligations under the Agreement.

126. Plaintiffs seek damages for breach of the Agreement.

127. As a direct and proximate result of the Defendants' breaches, Plaintiffs have

suffered, and continue to suffer financial losses.

128. The Defendants' conduct is without excuse or justification.

## COUNT III
### Pennsylvania Wage Payment and Collection Law
### (Plaintiff Suzanne Richards v. All Defendants)

129. Plaintiffs repeat and incorporate by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

130. Defendants violated the Pennsylvania Wage Payment and Collection Law ("WPCL") when they failed to pay Ms. Richards her earned wages, including her $500,000 earned bonus, within the time specified by law.

131. At all relevant times, Defendants were employers within the meaning of 43 Pa. C. S. 260.2(a) of the WPCL.

132. At all relevant times, Defendant Joel Freedman was a person and employer within the meaning of 43 Pa. C. S. 260.2(a) of the WPCL, and an active decision-maker with respect to Ms. Richards' unpaid wages.

133. At all relevant times, Defendant AAHS was an employer within the meaning of 43 Pa. C. S. 260.2(a) of the WPCL with respect to Ms. Richards' unpaid wages.

134. At all relevant times, Defendant Paladin was an employer within the meaning of 43 Pa. C. S. 260.2(a) of the WPCL with respect to Ms. Richards' unpaid wages.

135. Defendants willfully failed to pay Plaintiff Suzanne Richards wages earned as defined by the WPCL during the course of her employment within the time limits prescribed by the WPCL.

136. Following the cessation of Plaintiff Suzanne Richards' employment, Defendants willfully failed to pay her wages earned within the time limits prescribed by the

WPCL.

137. Defendants have failed to pay wages due for a period in excess of thirty (30) days beyond regularly scheduled paydays.

138. As the direct and proximate result of Defendants' violation of the Pennsylvania Wage Payment and Collection Law, Plaintiff Suzanne Richards has sustained a loss of earnings, liquidated damages, and interest due thereon and has incurred attorneys' fees and costs.

**COUNT IV**
**Fraudulent Inducement**
**(Plaintiffs v. All Defendants)**

139. Plaintiffs repeat and incorporate by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

140. Defendants misled Plaintiffs with respect to their intentions regarding the Agreement and the verbal or implied Agreement, by fraudulently misrepresenting to Plaintiffs:

    a. their intention to compensate Ms. Richards at the rate of $3,000 per day for on-site work, $500 for travel of greater than four hours when travel was not on a day billed as an on-site day, and $300 per hour for off-site product work.

    b. Their intention to compensate Ms. Richards' employees at SMR at certain daily, travel and off-site hourly rates as well.

    c. Their intention that any late payments by Defendants would be subject to a 3% interest rate, to be compounded monthly.

    d.   Their intention to pay a bonus of $500,000 at the end of the initial term – four months after September 20, 2018.

    e.   Their intention with respect to providing twenty (20) business days' prior written notice in the event they decided to terminate the Agreement without cause.

    f.   Attempting to mislead or confuse Plaintiff by their conduct and statements.

141. Plaintiffs relied on the false and/or misleading statements, conduct and representation of the Defendants and sustained the losses and damages as previously set forth herein.

**COUNT V**
**Promissory Estoppel/Detrimental Reliance**
**(Plaintiff v. All Defendants)**

142. Plaintiffs repeat and incorporate by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

143. Defendants promised Plaintiffs that Ms. Richards was to be compensated at the rate of $3,000 per day for on-site work, $500 for travel of greater than four hours when travel was not on a day billed as an on-site day, and $300 per hour for off-site product work.

144. Defendants promised that Ms. Richards' employees at SMR were to be compensated by Defendants at certain daily, travel and off-site hourly rates as well.

145. Defendants promised that any late payments by Defendants would be subject to a 3% interest rate, to be compounded monthly.

146. Defendants promised that Plaintiffs were entitled to a bonus of $500,000 at the end of the initial term – four months after September 20, 2018.

147. Defendants promised that they would only terminate the Agreement without cause on twenty (20) business days' prior written notice.

148. Plaintiffs reasonably relied upon these promises to their detriment by allowing Defendants to trade on their good name, by working tirelessly and providing staff to provide services for Defendants, and by perform services to attempt to rescue the failing operation.

149. Defendants did not honor their promises, as they have outstanding invoices due to Plaintiffs in excess of $300,000 which are accruing late payment penalties at the rate of three percent, compounded monthly.

150. Defendants did not honor their promises, as they did not pay the earned $500,000 bonus, and they did not provide the required 20 business days of notice.

151. For the reasons set forth above, Defendants are liable to Plaintiff under a theory of Promissory Estoppel or Detrimental Reliance.

<u>**COUNT VI**</u>
**Unjust Enrichment**
**(Plaintiffs v. All Defendants)**

152. Plaintiffs repeat and incorporate by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

153. Plaintiffs conferred benefits upon Defendants by allowing Defendants to trade on their good name, by working tirelessly and providing staff to provide services for Defendants, and by performing services to attempt to rescue the failing operation.

154. Defendants appreciated the benefits conferred by Plaintiffs.

155. Defendants accepted the benefits of Plaintiffs allowing Defendants to trade on their good name, by working tirelessly and providing staff to provide services for Defendants, and by performing services to attempt to rescue the failing operation.

156. Defendants accepted the benefits conferred on them by Plaintiffs under circumstances that would make it inequitable for Defendants to retain such benefits without payment of value to Plaintiffs.

157. Defendants agreed to the value of the benefits conferred upon them by Plaintiffs. The value of these benefits is reflected in invoices sent to Defendants but still unpaid, and an as yet unpaid $500,000 bonus.

158. Defendants have not paid their outstanding invoices that total in excess of $300,000, nor the late penalty on that amount, nor have they paid the earned $500,000 bonus payment.

159. For the reasons set forth above, Defendants are liable to Plaintiffs under a theory of Unjust Enrichment.

## COUNT VII
### Defamation
### (Plaintiffs v. All Defendants)

160. Plaintiffs repeat and incorporate by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

161. The above-described conduct of Defendants constituted actionable defamation.

162. In publishing false, negative information to third parties, including the Philadelphia Inquirer, a CEO of a prominent Philadelphia based medical group, and others, regarding Ms. Richards and her company, Defendants defamed Plaintiffs.

163. At the time of their publication, the false, negative statements made by Defendants harmed the reputation of Ms. Richards and SMR in the estimation of the community by creating a false impression that, among other things, Ms. Richards was unfit to conduct her business, trade or profession.

164. Third parties to whom the false, negative statements were published understood that the statements were about Ms. Richards and SMR.

165. Defendants promulgated the untrue statements with knowledge, among other things, that Ms. Richards had not been fired after only two months and was not unfit to conduct her business, trade or profession.

166. Defendants promulgated the untrue statements with reckless disregard for their truth or falsity.

167. Defendants were not privileged to publish the false, negative information to third parties regarding Plaintiffs.

168. Defendants' promulgation of the untrue statements exposed Plaintiffs to contempt, ridicule and degradation of character.

169. As the direct and proximate result of Defendants' defamation, Ms. Richards has sustained a loss of earnings, severe emotional and psychological distress, loss of self-esteem, loss of future earning power, damage to her and SMR's reputation, along with and/or in addition to the damages and losses set forth herein.

## PRAYER FOR RELIEF

170. Plaintiffs repeat and incorporate by reference the allegations of all previous paragraphs as fully as though the same were set forth at length herein.

**WHEREFORE**, Plaintiffs Suzanne Richards and SMR Healthcare Management,

Inc. respectfully request that this Court enter judgment in their favor and against Defendants and enter an Order:

    (a)    Ordering appropriate equitable relief;

    (b)    Ordering Defendants to pay Plaintiff Suzanne Richards' unpaid wages;

    (c)    Ordering Defendants to pay Plaintiffs for the damages suffered as a result of Defendants' breach of contract;

    (d)    Ordering Defendants to pay Plaintiffs liquidated or punitive damages;

    (e)    Ordering Defendants to pay Plaintiffs for the damages suffered as a result Defendants' defamation;

    (f)    Ordering Defendants to pay Plaintiffs' attorneys' fees and costs of suit; and

    (g)    Such other and further relief as is deemed just and proper.

### JURY DEMAND

Plaintiffs hereby demand trial by jury as to all issues so triable.


Jennifer C. Bell, Esquire
PA Attorney I.D. No.  81045
Christopher A. Macey, Jr., Esquire
PA Attorney I.D. No. 207800
Bell & Bell LLP
1617 JFK Blvd. – Suite 1254
Philadelphia, PA 19103
(215) 569-2500

Attorneys for Plaintiffs

DATE: January 23, 2020

**<u>CERTIFICATE OF SERVICE</u>**

I, Jennifer C. Bell, hereby certify that on January 23, 2020, a true and correct copy

of the foregoing Amended Complaint was served upon Counsel for Defendants by

electronic and first-class mail, addressed as follows:

Michael D. Jones, Esq.
Rachel E. King, Esq.
Eckert Seamans Cherin & Mellott, LLC
50 South 16th Street
Philadelphia, PA 19102
mdjones@eckertseamans.com
rking@eckertseamans.com


_____
Jennifer C. Bell

Dated: January 23, 2020