**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **SUZANNE RICHARDS,** et al., | **CIVIL ACTION** |
| Plaintiffs, | |
| *v.* | **NO. 2:20-cv-00059-KSM** |
| **AMERICAN ACADEMIC HEALTH SYSTEM, LLC**, et al., | |
| Defendants. | |

**MEMORANDUM**

**MARSTON, J.**                                                    **May 22, 2020**

Plaintiff Suzanne Richards ("Richards"), Chief Executive Officer ("CEO") of Plaintiff

SMR Healthcare Management, Inc. ("SMR") (collectively, "Plaintiffs"), entered into a

consulting services contract with Defendant Joel Freedman's company, Philadelphia Academic

Health System, LLC ("PAHS").[1] Plaintiffs filed suit against Defendants Freedman, American

Academic Health System, LLC ("AAHS"), and Paladin Healthcare Capital, LLC ("Paladin")

(collectively, "Defendants") in the Court of Common Pleas of Philadelphia County, for breach of

written contract; breach of verbal or implied contract; violation of the Pennsylvania Wage

Payment and Collection Law; promissory estoppel/detrimental reliance; unjust enrichment;

fraudulent inducement; and defamation. (Doc. No. 1.) On January 2, 2020, Defendants removed

the action to this Court. Presently before the Court is Defendants' Second Motion to Compel

Arbitration and Stay Proceedings, brought pursuant to the arbitration clause in the consulting

---

[1] Freedman is the CEO of PAHS, which is presently in bankruptcy proceedings. Plaintiffs have not named PAHS as a defendant in this action.

service agreement executed by Richards, on behalf of SMR, on September 20, 2018. (Doc. No. 16.) For the reasons outlined below, the Motion to Compel Arbitration and Stay Proceedings will be granted.

## I. *Factual and Procedural Background*[2]

Joel Freedman ("Freedman") is the owner and CEO of PAHS and AAHS, as well as the former owner and CEO of Paladin. (Am. Compl. ¶¶ 17, 34.) PAHS, AAHS, and Paladin are business entities that used their corporate identities interchangeably, as well as shared resources, including employees. (*Id.* ¶¶ 28–32.) In January 2018, Freedman, through his companies PAHS, AAHS, and Paladin, acquired Hahnemann University Hospital and St. Christopher's Hospital for Children, both located in Philadelphia, Pennsylvania. (*Id.* ¶ 34.) During the summer of 2018, Freedman and his companies "aggressively recruited" Richards, the CEO of SMR, to provide consulting services. (*Id.* ¶¶ 35, 36.) On September 20, 2018, after Defendants' "extensive recruitment efforts," SMR entered into a consulting services agreement[3] ("CSA") with PAHS, (*id.* ¶¶ 36, 37), to provide certain consulting services described as follows:

> (i) assist the CEO to oversee and administer the business on a day-to-day basis; (ii) perform a full operational and clinical assessment of the PAHS health system; (iii) identify areas for clinical and financial improvement; (iv) perform talent assessment with respect to the C-Suite and managers/directors across the organization; (v) perform an assessment of facility operations to include actionable items and a cost-savings report with timelines with an initial focus on Hahnemann University Hospital; and (vi) other duties as may be assigned from time to time.

(Doc. No. 1 at 42.)

---

[2] For purposes of this opinion, the Court accepts as true all factual allegations in the Amended Complaint. *See infra* Section III.

[3] The CSA contains signature blocks for Freedman as CEO of PAHS, and Richards as CEO of SMR. The Court notes that the copy of the CSA attached to the initial complaint did not include the signature page executed by Freedman on behalf of PAHS. However, Plaintiffs and Defendants agree that SMR and PAHS fully executed the document. (Doc. No. 1 at 41.)

The CSA also includes an arbitration clause that states:

> Any dispute or controversy arising under, out of or in connection with, or in relation to this Agreement, or any amendment hereof, or the breach hereof shall be determined and settled by final and binding arbitration in the county in which PAHS is located in accordance with the Commercial Rules of Arbitration ("**Rules**") of the Judicial Arbitration and Mediation Services ("**JAMS**") before one arbitrator applying the laws of the Commonwealth of Pennsylvania. The parties shall attempt to mutually select the arbitrator. In the event they are unable to mutually agree, the arbitrator shall be selected by the procedures prescribed by the JAMS Rules. Any award rendered by the arbitrator shall be final and binding upon each of the parties, and judgment thereof may be entered in any court having jurisdiction thereof. The costs shall be borne equally by both parties. The provisions set forth herein shall survive expiration or other termination of this Agreement, regardless of the cause of such termination.

(Doc. No. 1 at 39.)

The CSA provides that Richards would be compensated at the rate of $3,000 per day for on-site work, $300 per hour for off-site work, $500 for certain travel expenses, as well as a $500,000 bonus at the end of the initial four-month term. (Am. Compl. ¶¶ 38, 41.) The CSA also provides that late payments would be subject to a 3% interest rate and that any party could terminate the CSA without cause by providing twenty business days' notice. (*Id.* ¶¶ 40, 42.)

When Defendants hired Richards, Defendants' operations were in "relative chaos" and in desperate need of Richards' services as Freedman himself admitted that he "did not understand operations," did not "have anyone who knew what they were doing," and he was "losing money." (*Id.* ¶¶ 43, 44.) Richards worked to make the organization a success, and Freedman "constantly pressured" Richards to become a full-time employee with an ownership interest in the organization. (*Id.* ¶¶ 45, 47.) By December 2018, Freedman was pressuring Richards to accept a position as CEO. (*Id.* ¶¶ 49, 50.)

Throughout January and early February 2019, Freedman praised Richards' services and publicly referred to Richards as the "System CEO" and "new interim CEO," despite Richards

reminding Freedman that she was only providing consulting services on an interim basis. (*Id.* ¶¶ 50, 52, 53, 55–60.)

In February 2019, Richards took a short time off to have scheduled surgery, and shortly thereafter, Richards began to have problems with Freedman, including inappropriate sexual comments. (*Id.* ¶¶ 61, 64–66, 70, 71.) As the issues escalated, Richards felt she had no choice but to resign and terminate SMR's contract with PAHS. (*Id.* ¶ 72.) On March 3, 2019, pursuant to the terms of the CSA, Richards provided notice of termination. (*Id.* ¶ 73.) The next day, March 4, 2019, Freedman sent Richards an email informing her that she was "gone immediately." (*Id.* ¶ 74.)

At the time of Richards' resignation, Plaintiffs were owed significant amounts of money for services performed pursuant to the CSA. (*Id.* ¶¶ 75, 76.) Richards was told that she should walk away from the money owed to her as Freedman "will destroy you." (*Id.* ¶ 76.) Over approximately the next two months, Freedman allegedly made several public, derogatory, and defamatory statements regarding Richards' termination. (*Id.* ¶¶ 77–83.)

 Plaintiffs filed a civil action against Defendants in the Court of Common Pleas of Philadelphia County. (Doc. No. 1, Ex. A.) Defendants removed the case to federal court (Doc. No. 1.) and filed their first Motion to Compel Arbitration and Stay Proceedings. (Doc. No. 6.) Plaintiffs subsequently filed their Amended Complaint against Defendants, bringing claims for (i) breach of written contract; (ii) breach of verbal or implied contract; (iii) violation of Pennsylvania Wage Payment and Collection Law; (iv) fraudulent inducement; (v) promissory estoppel/detrimental reliance; (vi) unjust enrichment; and (vii) defamation. (Doc. No. 9.) Defendants then filed their Second Motion to Compel Arbitration and Stay Proceedings (Doc.

No. 16), and Plaintiffs filed a Response in Opposition. (Doc. No. 18.) Defendants subsequently

filed a Reply in Support of their Second Motion to Compel Arbitration. (Doc. No. 20.)

## II. *Parties' Contentions*

### A. *Defendants*

Defendants AAHS, Paladin, and Freedman argue that the arbitration clause contained in

the CSA is a valid contract under Pennsylvania law and that the language of the clause is clear

and unambiguous. Although Defendants are not signatories to the CSA, Defendants argue that

Plaintiffs, as signatories to the CSA, are estopped from avoiding arbitration with Defendants

when Plaintiffs' claims arise out of or directly relate to the CSA. Defendants argue that

Pennsylvania and federal policies favoring arbitration support their arguments that all of

Plaintiffs' claims in the Amended Complaint are subject to binding arbitration.

### B. *Plaintiffs*

Plaintiffs Richards and SMR contend that the arbitration clause should not be enforced

because (1) Defendants are not signatories to the CSA; (2) the arbitration clause is procedurally

and substantively unconscionable; and (3) Plaintiffs' claims fall outside the scope of the CSA.

Plaintiffs also argue that to the extent the Court finds that Plaintiffs' claims are subject to

arbitration, Plaintiffs are entitled to limited discovery on the issue of arbitrability.

## III. *Jurisdiction and Standard of Review*

This Court has diversity jurisdiction over this matter under 28 U.S.C. § 1332.

A district court will review a motion to compel arbitration pursuant to the motion to

dismiss standard of review if arbitrability is apparent on the face of the complaint and

incorporated documents, and the opposing party fails to set forth reliable, additional evidence

showing that it did not intend to be bound by the arbitration clause. *See Guidotti v. Legal Helpers*

*Debt Resolution, LLC,* 716 F.3d 764, 774 (3d Cir. 2013). If, however, arbitrability is not apparent on the face of the complaint and its supporting documents, or the opposing party has come forth with reliable evidence that it did not intend to be bound by the clause, the Court will order discovery on the issue of arbitrability and then consider the renewed motion pursuant to the Rule 56 summary judgment standard. *Id.* at 774–75; *see also Silfee v. Automatic Data Processing, Inc.*, 696 F. App'x 576, 578 (3d Cir. 2017).

In this action, as outlined below, the Court finds that the arbitration clause is a valid contract and there is no basis to find that the clause is unconscionable. The Court finds that arbitrability is apparent on the face of the complaint and supporting documents. The CSA was attached to the initial complaint and is relied upon and incorporated in the Amended Complaint.[4] (Doc. No. 1 at 34–43; Doc. No. 9). Although Plaintiffs contend that Defendants, as non-signatories to the CSA, cannot enforce the CSA's arbitration clause and that the arbitration clause is unconscionable (issues addressed in turn below), Plaintiffs fail to provide any reliable evidence that Plaintiffs did not intend to be bound by the clause. Discovery is thus not warranted.[5] The Court will adjudicate the pending motion pursuant to the Rule 12(b)(6) motion to dismiss standard of review. *See Guidotti,* 716 F.3d at 772.

---

[4] The contract containing the arbitration clause does not need to be attached to the operative complaint. Rather, it simply needs to be relied upon or incorporated in the complaint. *See, e.g., Lawson v. City of Phila.*, No. 18–1912, 2019 WL 934976, at *2 (E.D. Pa. Feb. 25, 2019) ("An arbitration clause may be deemed 'apparent' even when a 'contract[ ], though not appended to the Complaint, [is] integral to, and referenced in, the Complaint.' . . . Accordingly, when 'the arbitration clause at issue appears in a contract relied upon in the Complaint, [the court] resolve[s] the motion to compel arbitration under a motion to dismiss standard'" (citing *CardioNet, Inc. v. Cigna Health Corp.,* 751 F.3d 165, 168 n.2 (3d Cir. 2014))); *Curtis v. Cintas Corp.*, 229 F. Supp. 3d 312, 315–16 (E.D. Pa. 2017) (opining that the Court would consider the contract, despite it not being mentioned in the complaint, because it was "clearly integral" to the plaintiff's claims); *Johnson v. Ergon West Virginia, Inc.*, No. 14–453, 2015 WL 5286234, at *2 (W.D. Pa. Sept. 10, 2015) ("Although not attached to the Second Amended Complaint . . . the Contract is a document relied upon in said Complaint—submitted by Defendant as an exhibit to the Motion to [Compel Arbitration]—and thus it will be considered by the Court.").

[5] Discovery is not warranted without reliable evidence that "is more than a naked assertion . . . that [the party] did not intend to be bound by the arbitration clause." *Guidotti,* 716 F.3d at 774 (internal quotations omitted). Plaintiffs allege that the "adhesiveness of the Arbitration Provision is clear from a simple review of the contract" and a

## IV. *Analysis*

### A. *Defendants as Non-Signatories May Enforce the Arbitration Clause*

The Court first addresses whether Defendants, despite being non-signatories to the CSA, may nevertheless compel arbitration.

The Federal Arbitration Act ("FAA") "express[s] a strong federal policy in favor of resolving disputes through arbitration." *Century Indem. Co. v. Certain Underwriters at Lloyd's London*, 584 F.3d 513, 522 (3d Cir. 2009). A court may compel arbitration even as to non-signatories of the arbitration agreement under applicable state law doctrines of "assumption, piercing the corporate veil, alter ego, incorporation by reference, third party beneficiary theories, waiver and estoppel." *Noye v. Johnson & Johnson Servs.,* 765 F. App'x 742, 745–48 (3d Cir. 2019).

Here, Defendants seek to compel Plaintiffs to be bound by the arbitration clause based on the theory of alternative equitable estoppel. Under Pennsylvania law "alternative equitable estoppel," or "reverse estoppel," allows "non-signatories to an arbitration agreement [to] enforce such an agreement when there is an obvious and close nexus between the non-signatories and the contract or the contracting parties." *Id.* at 746 (citing *Dodds v. Pulte Home Corp.*, 909 A.2d 348, 351 (Pa. Super. Ct. 2006)). The Third Circuit in *Noye* specified that there need only be a "close nexus" between *either* (i) the non-signatory and a signatory, *or* (ii) the non-signatory and the contract. *Id.* at 746, n.6 & 7 (rejecting the conjunctive test previously set forth in *E.I. DuPont de*

---

"review of the Agreement itself also reveals that it is unmistakably a generic contract presented . . . on a take it or leave it basis." (Opp. Br. at 10–11.) As Plaintiffs are relying on the face of the CSA, which is already before the Court, these do not constitute "additional facts sufficient to place the agreement to arbitrate in issue." *Guidotti*, 716 F.3d at 776.  Further, any purported "additional facts" that Plaintiffs assert are either found in the Amended Complaint or are merely unsubstantiated, conclusory allegations. Plaintiffs cannot allege certain facts in the Amended Complaint—which must be taken as true for purposes of this decision—and then assert unsubstantiated allegations in its Opposition Brief that seemingly contradict the Amended Complaint.

*Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187 (3d Cir. 2001), and its progeny, and instead adopting the single factor test).

Although the Third Circuit has adopted the single factor test, here there is an obvious and close nexus between Defendants and the CSA, *and* Defendants and the signatories (Plaintiff SMR and non-party PAHS). Taking the Amended Complaint's factual allegations as true, the Court first finds an "obvious and close nexus" between the non-signatory Defendants and the CSA. Plaintiffs have brought suit against Defendants for breach of the CSA itself and for violations of promises contained in the CSA. (Doc. No. 9.) This provides the requisite nexus. *See, e.g.*, *Noye*, 765 F. App'x at 746 ("When examining the nexus with the contract, some courts consider whether the claims at issue are "inextricably entwined with the [c]ontract," . . . or "stem[] from the same incident and implicate[] identical legal principles[.]"); *Devon Robotics v. Deviedma*, No. 09-cv-3552, 2009 WL 4362822, at *4 (E.D. Pa. Nov. 30, 2009) ("[Reverse estoppel] generally applies when a signatory to the written agreement must rely on the terms of the agreement to assert its claim against the non-signatory such that the signatory's claims make reference to or presume the existence of the written agreement, or the signatory's claims arise out of and relate directly to the written agreement.").

Second, the Court finds that the factual allegations in the Amended Complaint also illustrate an obvious and close nexus between Defendants and the signatories. Plaintiffs allege non-signatory Defendants and signatory PAHS "used their corporate identities interchangeably" and "shared resources, including employees, during Ms. Richards' employment." (Am. Compl. ¶¶ 28, 30, 31.) Plaintiffs were paid by Defendant AAHS. (*Id.* ¶ 29.) Plaintiffs "performed significant work for and/or on behalf of" signatory PAHS and the non-signatory Defendants. (*Id.* ¶ 32.) Plaintiffs also performed "work on behalf of all of [Defendant Freedman's] companies

interchangeably." (*Id.* ¶ 54.) During this time, Defendant Freedman "had an active role in corporate decision-making" in the Defendant companies. (*Id.* ¶¶ 17, 21.) Each of the obvious and close nexuses between Defendants and the CSA, and Defendants and the signatories, individually make the theory of alternative equitable estoppel applicable in this case.

Plaintiffs mistakenly rely on *Shank v. Fiserv* and *Ellin v. Empire Today, LLC* to support their argument that Defendants, as non-signatories, should not be able to compel Plaintiffs to arbitrate. (Opp. Br. at 13–14.) In *Shank*, the arbitration clause specified that the parties' signatures were required for the clause to be enforceable. *Shank v. Fiserv, Inc.*, No. 15-cv-5319, 2016 WL 161902, at *3–4 (E.D. Pa. Jan. 14, 2016). Because the defendant did not sign the contract, the court concluded there was no valid contract because there was no intent to be bound to the contract, nor any consideration. *Id.* at *4. In contrast here, there is no requirement for Defendants' signature in order for the arbitration clause to be valid. As discussed below, under Pennsylvania law the clause is a valid contract.

Plaintiffs' reliance on *Ellin* is likewise misplaced. The court in *Ellin* concluded that a non-signatory could not enforce the arbitration agreement because the non-signatory was neither a signatory to the agreement, nor referenced by the signatories to be a third-party beneficiary. *Ellin v. Empire Today, LLC*, No. 11–2312, 2011 WL 3792754, at *4–5 (E.D. Pa. Aug. 24, 2011). The court, however, did not consider whether the non-signatory could enforce the arbitration agreement under the doctrine of alternative equitable estoppel. *Id.* As such, *Ellin* is not applicable to this case.

For these reasons, the Court concludes that Defendants, as non-signatories to the CSA, can enforce the arbitration clause as to Plaintiffs pursuant to the doctrine of alternative equitable estoppel.

**B.  *Contract Validity***

 "A motion to compel arbitration calls for a two-step inquiry into (1) whether a valid

agreement to arbitrate exists and (2) whether the particular dispute falls within the scope of that

agreement." *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005).

A district court looks to relevant state law on the formation of contracts to determine if a

valid arbitration agreement exists. *See, e.g., First Options of Chicago, Inc. v. Kaplan,* 514 U.S.

938, 944 (1995). A federal court sitting in diversity must apply the substantive law of the state in

which the court sits, including its choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313

U.S. 487, 496 (1941). Here, the parties do not dispute that Pennsylvania law applies.

Under Pennsylvania law, a valid contract exists when (i) the parties have manifested an

intent to be bound by the terms of the agreement; (ii) the terms are sufficiently definite; and (iii)

there is consideration. *Cardinale v. R.E. Gas Dev., LLC*, 74 A.3d 136, 140 (Pa. Super. Ct. 2013)

(citing *Johnston the Florist, Inc. v. TEDCO Const. Corp.*, 657 A.2d 511, 516 (Pa. Super. Ct.

1995)); *see also Blair v. Scott Specialty Gases*, 283 F.3d 595, 603 (3d Cir. 2002). If these three

elements exist, the contract is valid and binding. *Cardinale*, 74 A.3d at 140.

The parties do not dispute that the terms of the arbitration clause are sufficiently definite.

Instead, Plaintiffs argue that because Defendants are not signatories to the CSA, Defendants did

not manifest an intent to be bound, nor was there any consideration given, and therefore, the

arbitration clause is not a valid contract. (Opp. Brief at 13–15.) Plaintiffs also argue that the

arbitration clause is procedurally and substantively unconscionable, and therefore it cannot be

enforced. (*Id.* at 8–12.)

As to Plaintiffs' claim that Defendants as non-signatories cannot enforce the arbitration

clause, Plaintiffs' arguments are flawed. Plaintiffs conflate the issue of a contract's *validity* with

10

the issue of a contract's *enforceability*.[6] Defendants' non-signatory status is relevant to whether

they can *enforce* the arbitration clause. The question as to the contract's validity, however, is not

dependent on whether a non-signatory can enforce the contract. Indeed, as discussed above,

Pennsylvania law allows *non-signatories* to enforce a valid contract in certain instances. If

Plaintiffs' arguments were correct—that there was no valid contract because Defendants are not

signatories—it would make needless and irrelevant the established law allowing a *non-signatory*

to enforce an arbitration agreement.

Here, the signatories of the CSA are Plaintiff SMR and non-party PAHS. The question of

the contract's *validity* is whether SMR and PAHS—the parties to the CSA—manifested an intent

to be bound by the terms of the arbitration clause and provided consideration. Plaintiffs do not

contest that SMR and PAHS manifested an intent to be bound by the terms of the arbitration

clause. (Am. Compl. ¶¶ 37–42, 102–115; Opp. Br. at 2.) Further, the arbitration clause

specifically provides, "[a]ny award rendered by the arbitrator *shall be final and binding upon*

*each of the parties*. . . ." (Doc. No. 1 at 39 (emphasis added).)

Plaintiffs also do not contest that SMR and PAHS exchanged sufficient consideration.

(Am. Compl. ¶¶ 37–42, 102–115; Opp. Brief at 2.) Indeed, the parties' agreement to be bound by

arbitration is sufficient consideration by itself. *See Blair*, 283 F.3d at 603 ("When both parties

have agreed to be bound by arbitration, adequate consideration exists and the arbitration

agreement should be enforced."). Because SMR and PAHS manifested an intent to be bound by

---

[6] The Court seeks to avoid conflating the issues of validity and enforceability. This is because a contract that is *invalid* is always *unenforceable*; but a contract that is *valid* can be *enforceable* to some (*e.g.*, the parties to the contract), while *unenforceable* to others (*e.g.*, non-parties). Because a contract that is unenforceable to some can still be valid and enforceable to others, the Court concludes that separate analyses for validity and enforceability are warranted here.

the terms of the arbitration clause, SMR and PAHS provided sufficient consideration. The arbitration clause contains all the elements for a valid contract.

### C. *Unconscionability*

We turn next to Plaintiffs' claim that the arbitration clause is unenforceable because it is procedurally and substantively unconscionable. The FAA "places arbitration agreements on 'an equal footing with other contracts' and thus, like any other contract, a plaintiff may bring a challenge to court claiming that an agreement to arbitrate is unenforceable based on any of the 'generally applicable contract defenses, such as fraud, duress, or unconscionability . . . .'" *Quilloin v. Tenet HealthSys. Phila., Inc.* 673 F.3d 221, 228–29 (3d Cir. 2012) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011)). "[R]egardless of whether a contract as a whole is valid, agreements to arbitrate are severable from a larger contract, and may therefore be separately enforced and their validity separately determined." *Id.* at 229.

Under Pennsylvania law, the party challenging an arbitration agreement bears the burden of showing that the arbitration agreement is both procedurally and substantively unconscionable. *See Zimmer v. CooperNeff Advisors, Inc.*, 523 F.3d 224, 230 (3d Cir. 2008); *Quilloin*, 673 F.3d at 230. Procedural unconscionability has been described by the Pennsylvania Supreme Court as the "absence of meaningful choice on the part of one of the parties" regarding the acceptance of the provisions. *Witmer v. Exxon Corp.*, 434 A.2d 1222, 1228 (Pa. 1981). Procedural unconscionability focuses on "the process by which an agreement is reached and the form of an agreement, including the use therein of fine print and convoluted or unclear language." *Zimmer*, 523 F.3d at 228.

Under Pennsylvania law, a contract of adhesion—which is a "standard-form contract prepared by one party, to be signed by the party in a weaker position, usually a consumer, who

adheres to the contract with little choice about the terms"—is generally considered procedurally unconscionable. *Quillion,* 673 F.3d at 235 (citing *Chepkevich v. Hidden Valley Resort, L.P.*, 2 A.3d 1174, 1190 (Pa. 2010)). Yet, contracts are not found unconscionable "simply because of a disparity in bargaining power." *Witmer,* 434 A.2d at 1228.

Pennsylvania courts and the Third Circuit have repeatedly opined that contracts of adhesion are generally found procedurally unconscionable because they target disadvantaged consumers. Such contracts of adhesion are "offered to consumers of goods and services on essentially 'take it or leave it' basis." *Denlinger, Inc. v. Dendler*, 608 A.2d 1061, 1066 (Pa. Super. Ct. 1992).

In *Denlinger*, the Superior Court of Pennsylvania discounted the party's arguments that the agreement at issue was a contract of adhesion because "neither party is a consumer," the agreement involved "commercial enterprises . . . [and] corporations," and the complaining party was "an experienced businessman" despite having only a high school education. *Id.* at 1066. The *Denlinger* court minimized the purported adhesiveness of the agreement because "it would be improper to borrow, without differentiation, concepts developed to protect consumers and employ them in favor of one commercial party over another." *Id.* (internal citations and quotations omitted); *see also Shaffer v. Graybill*, 68 F. App'x 374, 377 (3d Cir. 2003) (noting that "in *Denlinger* itself, the court expressed its lack of concern for unequal bargaining power when neither of the parties involved were consumers" and concluding that the purported adhesion contract was not procedurally unconscionable because, *inter alia*, the complaining party was an "experienced businessman").

Here, Plaintiffs argue that the arbitration clause is a contract of adhesion because (i) Defendants "own and operate numerous distinguished hospitals," while Richards created SMR in

July 2018 to employ consultants and managers; (ii) the terms of the CSA reveal "it is

unmistakably a generic contract . . . presented on a take it or leave it basis . . . with no

opportunity . . . to negotiate any terms;" and (iii) Richards "felt that she had no other choice but

to sign the [CSA]." (Opp. Br. at 10–11.)

Plaintiffs cite *Nino v. Jewelry Exchange, Inc.* and *Alexander v. Anthony Int'l, L.P.* in

support of their procedural unconscionability argument, neither of which have facts similar to the

case before this Court. Rather, both of these cases highlight why the arbitration clause here does

*not* rise to the level of procedural unconscionability. The Third Circuit in *Quillon* aptly

distinguished *Nino* and *Alexander* in a way that is relevant in this action:

> [In *Nino*], we found procedural unconscionability in an employment agreement
> where the employee, though college educated, was told to read and sign an
> employment contract, and was dependent on the employer . . . for his immigration
> status and his "very capacity to work in St. Thomas[.]". . . . Similarly [in
> *Alexander*], we held unconscionable an arbitration agreement between a multi-
> national business and minimally-educated crane operators. Quilloin's situation is
> nothing like that of the plaintiffs in *Nino* or *Alexander*. . . . The District Court
> acknowledged that Tenet had less bargaining power than the multinational
> corporations in both of those cases. More importantly, Quilloin was neither a
> minimally-educated crane operator as were the plaintiffs in *Alexander*, nor
> dependent on her employer for her immigration status as was the plaintiff in *Nino*.

*Quilloin*, 673 F.3d at 236 (citing *Nino v. Jewelry Exch., Inc.*, 609 F.3d 191, 196–97, 202 (3d Cir.

2010) and *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 266 (3d Cir. 2003)). Like Quilloin,

Plaintiffs here are also nothing like the plaintiffs in *Nino* and *Alexander.* To the extent there is

any merit to Plaintiffs' claim that they had a lesser bargaining power than PAHS, Plaintiffs'

position was nowhere near that of the minimally-educated crane operators nor the employee

dependent on her employer for her immigration status.

Here, the arbitration clause is between commercial enterprises and involves corporate

entities and experienced professionals. Moreover, a review of the factual allegations in Plaintiffs'

Amended Complaint—which are to be taken as true under the applicable Rule 12(b)(6) standard—undermine Plaintiffs' arguments. Throughout the Amended Complaint, Plaintiffs allege that: Defendants "aggressively recruited" Plaintiffs (¶ 35); Defendants hired Plaintiffs only "[a]fter extensive recruitment efforts" (¶ 36); Defendants agreed to pay Plaintiffs $3,000 per day for on-site work (¶ 38), $300 per hour for off-site work (¶ 38), and a $500,000 bonus for four months of work (¶ 41); Plaintiffs were hired to perform sophisticated job duties (¶ 37); when Defendants hired Plaintiffs, Defendants' operations were in "chaos," run by Freedman who "did not understand operations," and no one within Defendants' organization "knew what they were doing" so Defendants were "losing money" (¶¶ 43–44); Plaintiffs' task was to "turn the organization around and put it on a path for success" (¶ 45); and Richards had a "stellar" reputation during the time of negotiations (¶ 84).

The Court, taking all these allegations in the Amended Complaint as true, finds that Plaintiffs cannot now claim that Plaintiffs lacked negotiating power and were compelled to accept the Agreement on "a take it or leave it" basis. Indeed, the Amended Complaint suggests that Defendants needed Plaintiffs more than Plaintiffs needed Defendants. As such, the Court does not find that Plaintiffs showed that they "lack[ed] . . . meaningful choice in the acceptance of the challenged provision." *Quilloin*, 673 F.3d at 235. Nor does the Court find that Plaintiffs had "little choice about the terms." *Id.* Even if Defendants had greater bargaining power, that is not enough to render the arbitration clause procedurally unconscionable as to these sophisticated professionals. *Id.*

Because Plaintiffs must establish that the arbitration clause is *both* procedurally and substantively unconscionable, the Court need not address whether the clause's fee-splitting provision is substantively unconscionable. *Zimmer*, 523 F.3d at 230; *see* Opp. Br. at 12. As

Plaintiffs cannot show that the arbitration clause is procedurally unconscionable, the arbitration clause is valid and enforceable.

**D.  *Scope of the Arbitration Clause***

Having concluded that a valid agreement to arbitrate exists, the Court turns to its final inquiry: whether the disputes in this case fall within the scope of the arbitration clause. *Trippe*, 401 F.3d at 532. If the dispute falls within the scope of the arbitration agreement, the Court must compel arbitration.

There is a strong presumption of arbitrability when reviewing the scope of a valid and enforceable arbitration agreement. *See, e.g.*, *Wood v. Prudential Ins. Co. of Am.*, 207 F.3d 674, 680 (3d Cir. 2000) ("[A]s a matter of federal law, any doubts concerning the scope of arbitration should be resolved in favor of arbitration . . . ." (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983))). The Supreme Court has held:

> [W]here the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that [a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

*AT&T Tech., Inc. v. Commc'n Workers of Am.*, 475 U.S. 643, 650 (1986). Thus, unless the Court has "positive assurance[s]" that the dispute falls outside the scope of the arbitration clause, the Court must compel arbitration. *Id.*; *Monfared v. St. Luke's Univ. Health Network*, 767 F. App'x 377, 379 (3d Cir. 2019).

The presumption in favor of arbitrability becomes stronger when the arbitration clause uses broad language. *See, e.g.*, *AT&T Tech*, 475 U.S. at 650. The Third Circuit has specifically singled out arbitration clauses containing the phrases "arising under" and "arising out of" as

16

having expansive coverage. *See, e.g.*, *Medtronic AVE Inc. v. Cordis Corp.*, 100 F. App'x 865, 868 (3d Cir. 2004) (internal citation omitted).

To determine whether a dispute falls within the scope of the arbitration agreement, the Court must review each individual dispute separately. *See Trippe*, 401 F.3d at 532. The Court focuses on the factual bases of the claim rather than the legal theory alleged in the complaint. *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 55 (3d Cir. 2001) ("To determine whether a claim falls within the scope of an arbitration agreement, the focus is on the factual underpinnings of the claim rather than the legal theory alleged in the complaint." (internal citations and quotations omitted)).

The arbitration clause at issue here contains broad language, including "arising under" and "arising out of." The clause states: "Any dispute or controversy arising under, out of or in connection with, or in relation to this Agreement, or any amendment hereof, or the breach hereof shall be determined and settled by final and binding arbitration . . . . The provisions set forth herein shall survive expiration or other termination of this Agreement, regardless of the cause of such termination." (Doc. No. 1 at 39.) This exceedingly broad language, coupled with the strong presumption in favor of arbitrability, is strong evidence for the arbitrability of all claims unless the non-moving party can "establish the existence of an express provision excluding the grievance from arbitration, or provide 'the most forceful evidence of a purpose to exclude the claim from arbitration.'" *Devon Robotics*, 2009 WL 4362822, at *4 (quoting *AT&T Tech.*, 475 U.S. at 650).

Also, consistent with the presumption in favor of arbitrability, because the CSA's arbitration clause includes several separate phrases, the Court presumes that each has a separate

meaning. Thus, the Court construes arising "under," "out of," "in connection with," and "in relation to" as covering different scopes of issues.

With the backdrop of the arbitration clause's broad language and the strong presumption in favor of arbitrability, the Court addresses each of Plaintiffs' seven claims in turn.[7]

### i.     *Breach of Written Contract*

Plaintiffs appear to concede that their breach of the written contract claim is within the scope of the arbitration clause.[8] But even if Plaintiffs have not conceded this claim, the Court finds breach of the written contract specifically falls within the scope of the arbitration clause as such a claim arises out of the breach of the CSA.

### ii.    *Breach of Verbal or Implied Contract*

The Court likewise concludes that Plaintiffs' claim of breach of verbal or implied contract is also within the scope of the arbitration clause. In pleading this claim, Plaintiffs allege that Defendants breached the same terms and promises that Plaintiffs alleged in their breach of written contract claim. As the same "factual underpinnings" apply to the breach of the written contract and breach of the verbal implied contract, this claim must also fall within the scope of the clause as it likewise arises out of or in connection with the CSA or the breach of the CSA.

---

[7] Plaintiffs argue that the claims are not within the scope of the arbitration clause, in part, because Defendants are not referred to in the CSA nor did they sign the CSA. (Opp. Br. at 16.) Because the Court has already addressed Defendants' non-signatory status above, it does not do so again here. Moreover, Plaintiffs' reliance on *Chassereau v. Glob.-Sun Pools, Inc.* is misplaced because it is a South Carolina state law case that is relying on (non-Pennsylvania) state court cases to determine if a claim falls within the scope of an arbitration agreement. 611 S.E.2d 305, 308 (S.C. Ct. App. 2005). It is thus inapposite. *Cf. Century Indem. Co.*, 584 F.3d at 524 ("[O]nce a court has found that there is a valid agreement to arbitrate, regardless of whether the action is in a federal or a state court the determination of whether a particular dispute is within the class of those disputes governed by the arbitration clause [] is a matter of federal law." (internal quotations omitted)).

[8] In their Opposition Brief, Plaintiffs state that their claim for breach of contract "may be encompassed by the Arbitration Clause. Plaintiffs' other claims, however, are not." (Opp. Br. at 16.)

### iii.   *Pennsylvania Wage Payment and Collection Law Violation*

Plaintiffs' claim for violation of the Pennsylvania Wage Payment and Collection Law is based on Defendants' alleged failure to timely pay Plaintiffs what is owed to Plaintiffs under the CSA. Plaintiffs claim the money owed includes earned wages and the $500,000 earned bonus as specified in the CSA. As such, this claim is inextricably entwined with the terms of the CSA, and thus arises under, out of, or in connection with the CSA. The Court finds that it falls within the scope of the arbitration clause.

### iv.   *Fraudulent Inducement*

The Court likewise concludes that Plaintiffs' fraudulent inducement claim is within the scope of the arbitration clause. This claim is based on Defendants' alleged fraudulent misrepresentations that Defendants would abide by the terms of the CSA. The fraudulent misrepresentations arise out of or in connection with the CSA or the breach thereof.

### v.   *Promissory Estoppel/Detrimental Reliance*

Plaintiffs' claim of promissory estoppel/detrimental reliance is within the scope of the arbitration clause. This claim alleges that Defendants made, but did not honor, certain promises that are the exact terms of the CSA and is inextricably entwined with the CSA. The Court finds that this claim arises out of or in connection with the CSA or the breach of the same.

### vi.   *Unjust Enrichment*

Plaintiffs' unjust enrichment claim alleges that Plaintiffs conferred benefits upon Defendants by performing services agreed upon under the CSA, but Defendants failed to pay the value of these services as specified in the CSA. Again, this claim arises out of or in connection with the CSA and falls within the scope of the arbitration clause.

vii.     *Defamation*

Plaintiffs argue that the alleged defamatory statements are "about Ms. Richards' character and professional ability and the reliability of her business, SMR" (Opp. Brief at 18), despite the fact the Amended Complaint alleges that the defamatory statements relate to (i) Richards' purported position as CEO during her employment under the CSA, and (ii) the termination of Richards' employment under the CSA.[9]

As pled in the Amended Complaint, the CSA created the employment relationship that Richards held with Defendants. The alleged defamation explicitly relates to the termination of that employment relationship. The Court concludes that the alleged defamation arises "out of or in connection with . . . this [CSA] . . . or the breach hereof." *Cf. Wood*, 207 F.3d at 681 (opining that because the alleged defamation "arose out of [Plaintiff's] employment *and its termination*," Plaintiff's claim was arbitrable (emphasis added)).

Plaintiffs' arguments to the contrary are unavailing. *See AT&T Tech.*, 475 U.S. at 650 (opining that unless the Court has "positive assurance[s]" that the dispute falls outside the scope of the arbitration clause, the Court must compel arbitration). First, while the alleged defamation occurred after the CSA was terminated, that does not cause the defamation claim to fall outside the scope of this expansive arbitration clause. *Goodwin v. Elkins & Co.*, 730 F.2d 99, 110 (3d Cir. 1984) (opining that "expansive [arbitration] clauses may cover not only disputes arising during the life of an agreement, but also those which arise from its demise").

Plaintiffs' reliance on *Nicholas v. Grapetree Shores*, *Devon Robotics v. Deviedma*, and *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.* fails to support Plaintiffs' contention

---

[9] Perhaps Plaintiffs are contending that the defamatory statements insinuated a lack of Richards' "character and professional ability and the reliability of her business." However, the Court will not speculate about the implicit meaning of these explicit statements, especially when the express meaning is clear.

that the defamation claim is not within the scope of the arbitration clause. In *Nicholas*, the plaintiff was terminated from the defendant's employment four years after they entered an expansive arbitration agreement, which included any "claims or matters arising out of or relating in any way to . . . Employee's dealings with Employer." *Nicholas v. Grapetree Shores, Inc.*, 392 F. App'x 7, 8 (3d Cir. 2010). After his termination, the plaintiff began organizing union efforts among the defendant's employees. *Id.* Two years after the plaintiff's termination, the defendant held a meeting of its employees to respond to the plaintiff's unionizing efforts. *Id.* At this meeting, the alleged defamatory statements were made. *Id.* The court concluded that the defamation claim was not within the scope of the arbitration agreement because the plaintiff's defamation claims "concern only what [the defendants] said about [the plaintiff] to others, years after the ending of his employment," and thus, the defamation claims did not relate to the plaintiff's and defendant's employment relations, but rather related to the plaintiff's "post-employment organizing efforts." *Id.* at 9.

In contrast, here, the alleged defamation specifically relates to Richards' employment relationship with Defendants, specifically Richards' termination. The alleged defamation began days after the termination. Unlike in *Nicholas*, the alleged defamatory statements were not made after Plaintiffs and Defendants entered a different, separate relationship years after the plaintiff's termination.

In *Devon Robotics*, the plaintiff and defendant entered into two agreements "for the distribution of two robotic medication preparation products for hospitals and health care facilities." *Devon Robotics*, 2009 WL 4362822, at *1. The agreements contained an expansive arbitration clause. *Id.* at *1, n.1. The defamatory statements consisted of an email that the defendant sent to some of the plaintiff's customers that claimed that the plaintiff "had laid off

key employees and that [the plaintiff] was facing financial difficulties and bankruptcy." *Id.* at *2. Because the statements did not involve the agreement to distribute two robotic medication preparation products for hospitals and health care facilities, the court concluded that the defamation claim was outside the scope of the arbitration agreement. *Id.* at *5.

*Devon Robotics* is distinguishable because here, the alleged defamatory statements relate specifically to the method and details of Richards' termination under the CSA, and therefore are related to the CSA that created the employment relationship in the first place.[10] The Court concludes the defamation claim falls within the scope of the arbitration clause.

Given the strong presumption of arbitrability and the broad scope of the language in the arbitration clause, all seven claims in the Amended Complaint are within the scope of the arbitration clause.

**V.  *Conclusion***

For the foregoing reasons, the Court grants Defendants' motion to compel arbitration and stay proceedings. *See* 9 U.S.C. §§ 3–4. An appropriate order follows.

---

[10] For similar reasons, the Court also finds that the 2nd Circuit's opinion in *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20 (2d Cir. 1995) is inapposite. (Opp. Br. at 21–22.)